THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | |
|---|---|
| PATTI LOU GILLUM and BILLY GILLUM, wife and husband, and the marital community composed thereof,<br><br>Appellants,<br><br>v.<br><br>TRAVIS VOGUE and MICHELLE VOGUE, husband and wife, and the marital community composed thereof,<br><br>Respondents. | No. 83467-3-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

ANDRUS, A.C.J. — Patti Gillum's mobile home straddles two lots in Ocean Park, Washington.[1] She owns one of the lots and Travis and Michelle Vogue purchased the other lot at a tax foreclosure in 2014 with the knowledge that Gillum's mobile home, the concrete pad on which it sits, and a structure enveloping the mobile home, encumber the property. The Vogues brought an action to eject Gillum from their property and the trial court granted injunctive relief, requiring Gillum to remove her mobile home and related structures at her expense. It is

---

[1] Patti Gillum identified herself as trial as Patti Addams. Her counsel, however, referred to her as Patti Gillum throughout trial and on appeal. We will follow their lead and do so here.

undisputed that removal will lead to the destruction of her home and that Gillum lacks the financial resources to replace it.

Gillum appeals, arguing that injunctive relief is not appropriate under the circumstances. Because the record does not support the trial court's findings that Gillum intentionally encroached on the adjacent lot and the trial court evaluated the impact of any resulting encroachment through an inappropriately narrow legal lens, we reverse.

FACTS

Before 1999, Monte and Dorothy Howell owned three adjacent lots (Lots 1, 2, and 3) in Ocean Park, Washington. Lot 1 was vacant, but a mobile home manufactured in 1963 straddled Lots 2 and 3. That year, Patti Gillum purchased Lots 1 and 2 and the mobile home from the Howells. Gillum did not know when the mobile home was installed on the property, but it was in place when she moved there in 1999. Gillum received a quit claim deed for the two lots and title to the mobile home.

Gillum also agreed to purchase Lot 3 from the Howells for $10,000, by making $100 installment payments each month. Although the parties stipulated to the admissibility of Exhibit 7, identified as the real estate purchase and sale agreement for Lot 3, the agreement in the record is not executed by the Howells. Gillum described the agreement as "verbal." According to Gillum, the Howells agreed to pay the property taxes on Lot 3 until she completed the purchase.

Gillum's sole source of income is social security disability income of $9,396 per year. At some point, Gillum ceased making installment payments for Lot 3

because she could not afford them. She does not remember how many payments she made or when she stopped.

Gillum's mobile home sits on a concrete slab and has a "storm barn" structure built around and over it. The storm barn has structural support posts set in concrete, and a roof built of wood trusses and corrugated fiberglass. The storm barn structure has end walls of wood and one side wall comprised of a plastic tarp. The concrete pad and storm barn structure, in place before Gillum moved into the mobile home, are clearly affixed to the land on both Lots 2 and 3.

The house trailer itself is in very poor shape. Gillum reported that there is rot in the foundation and the ceiling leaks. William Berwick, the president of a mobile home installation company, testified that he inspected the home four times and found significant dry rot on the home's outer rim joists and floor joists. He described the damage as "massive rim failure" with floor joists that were "totally deteriorated" and no longer connected to the rim joists. In Berwick's opinion, if he tried to lift up this trailer to move it, there would be a "significant outer wall failure." Berwick also noted that the screws attaching the exterior metal cladding were rusted out and they would pop off completely if he attempted to move the trailer.

In 2007, Travis and Michelle Vogue purchased two lots (Lots 4 and 5) directly south of Lot 3 and Gillum's home. They bought the property to use for camping and recreation and they and their family visit the property between four and seven times a year from their primary residence on Camano Island. They cleared and improved the land, installing a septic system, a well, and a pump house.

The Vogues' survey shows the location of their lots in comparison to those owned by Gillum and the Howells:



The survey also confirmed that Gillum's home sits on Lot 3 by some 27 feet:



In the spring of 2014, the Vogues learned that the Howells had listed Lot 3 for sale for $10,000. The Vogues considered purchasing it, but knew Gillum's mobile home sat partially on the lot and resolving Gillum's right to remain there would require them to incur litigation expenses in addition to the purchase price. They passed on buying Lot 3 at that time.

At some point, the Howells ceased paying property taxes on the lot and the Pacific County treasurer scheduled a foreclosure sale in December 2014. The Vogues learned of the public sale and purchased Lot 3 at the sale for $1,315.37 on December 12, 2014. They received a tax foreclosure sale deed on January 6, 2015.

Gillum was unaware that the Howells had stopped making tax payments and had no notice of the county's foreclosure sale. The Vogues did not tell her that they knew the property was going to be sold or that they intended to bid on the property. Gillum testified that had she learned of the foreclosure sale, she would have borrowed money from her sister or cousin to bid on the property.

The Vogues then brought this action for ejectment and quiet title against Gillum in March 2016. They asked the court to order Gillum to move her trailer off of Lot 3. Gillum asked to be permitted to purchase Lot 3, or to purchase an easement to a portion of the lot, so her home could remain. Gillum presented expert testimony at trial that the value of a life estate in an easement for the part of Lot 3 on which her home sat would be $3,279. The value of acquiring 623 square feet of Lot 3 to accommodate the home would be $5,000.

After a bench trial, the court found that Gillum's home encroaches onto the Vogues' Lot 3 by an area of 27 feet by 20 feet. It further found that, because of setback requirements, seasonal flooding, and wetness issues on the west side of Lot 3, this encroachment subsumes the entire lot, rendering it unusable for any other purpose. The court found that Gillum knew that her home partially sat on Lot 3, that there was no mistake or inadvertence as to the creation of the encroachment, and that she allowed this encroachment to continue. The court agreed that it was impractical to move Gillum's home and it would not survive an attempt to move it. But because the court found the encroachment to be significant, it concluded that the Vogues were entitled to injunctive relief and ordered Gillum to remove the encroachment at her expense, despite the obvious

hardship this decision will cause her. It rejected her request to acquire some interest in Lot 3 to avoid having to demolish her home, even though the demolition would by necessity extend to structures resting on the lot Gillum owns in fee.

ANALYSIS

Gillum argues that the trial court erred in ordering her to remove her mobile home and the structures built under and around that home, from the Vogues' land at her expense. We agree.

The parties argued this appeal under the law of encroachments, both relying on Proctor v. Huntington, 169 Wn.2d 491, 238 P.3d 1117 (2010), and Arnold v. Melani, 75 Wn.2d 143, 449 P.2d 800 (1968). Under these cases, our courts recognize the traditional rule that there is a right to eject an unlawful encroachment from one's land because that right "is among the most precious contained within the bundle of property rights." Garcia v. Henley, 190 Wn.2d 539, 540, 415 P.3d 241 (2018). But the court recognized an equitable exception to this traditional rule to "mitigate harsh or unjust results." Proctor, 169 Wn.2d at 497. In Arnold, our Supreme Court distilled an equitable test that allows a court to refuse to grant an injunction in an encroachment case:

> [A] mandatory injunction can be withheld as oppressive when . . . (1) The encroacher did not simply take a calculated risk, act in bad faith, or negligently, willfully or indifferently locate the encroaching structure; (2) the damage to the landowner was slight and the benefit of removal equally small; (3) there was ample remaining room for a structure suitable for the area and no real limitation on the property's future use; (4) it is impractical to move the structure as built; and (5) there is an enormous disparity in resulting hardships.

Arnold, 75 Wn.2d at 152. The encroaching party must prove these elements by clear and convincing evidence. Id.; Garcia, 190 Wn.2d at 540.

- 7 -

The parties agree that Gillum established the fourth and fifth elements of the Arnold test. It is undisputed that it is impractical to move the concrete pad, the storm barn structure and the mobile home. The resulting hardship to Gillum would be enormous, while the hardship to the Vogues is relatively minimal. The focus of this appeal is on the first three elements of the test. Gillum challenges the factual basis for the court's finding that she intentionally located an encroachment on Lot 3 and the court's decision to limit its analysis of the second and third elements to Lot 3 in isolation, without considering the Vogues' ownership of two adjacent lots.

(1) <u>Is Gillum an "encroacher" who took a calculated risk or acted "willfully" or "indifferently" in leaving the concrete pad, the storm barn and the mobile home on Lot 3?</u>

Gillum challenges the trial court's finding under the first Arnold element that she intentionally allowed an encroachment "to continue" on Lot 3. We agree that the record does not support the court's finding that Gillum was a willful or indifferent encroacher under the first Arnold element.

An "encroachment" is "[a]n infringement of another's rights," or "[a]n interference with or intrusion onto another's property." BLACK'S LAW DICTIONARY 667 (11th ed. 2019). An encroachment is a form of trespass. Proctor, 169 Wn.2d at 496. We conclude the trial court erred as a matter of law in concluding that Gillum created this encroachment or allowed it to continue.

The parties disagree as to when Gillum's structures became an encroachment. Gillum maintains no encroachment existed until the county sold the property to the Vogues. The Vogues argue the encroachment existed as soon as the Howells severed Lot 3 from Lots 1 and 2.

We conclude Gillum was not encroaching on Lot 3 when she moved into the mobile home because her agreement with the Howells to purchase Lot 3 gave her the beneficial use of that property. The vendee under a real estate contract has the right to possess the land and to exercise dominion and control of it. <u>Bays v. Haven</u>, 55 Wn. App. 324, 328, 777 P.2d 562 (1989). Her structures did not encroach on Lot 3 for as long as she had the right to use that property.

Although Gillum admits she defaulted at some point, the Howells took no steps to eject her for years (and perhaps decades). Gillum had no knowledge that the Howells failed to stay current on the property taxes or that the county had scheduled a tax foreclosure sale to satisfy unpaid taxes. Gillum reasonably believed she continued to have permission to keep her home, the concrete pad, and the storm barn structure on Lot 3, despite her non-payment. There is no evidence that Gillum understood the risk that the permission she had to occupy Lot 3 could be or had been rescinded.

Gillum's structures could not be an "encroachment" on Lot 3, in the legal sense, until—at the earliest—the Vogues purchased the lot at the tax foreclosure sale in late 2014 and communicated to Gillum their desire for her to move off of the lot. It is from that point in time that one must evaluate whether Gillum acted in bad faith or took a calculated risk that the owner of Lot 3 would not realize her structures crossed a boundary line. The record does not support any such finding.

We question whether the record even supports the conclusion that Gillum's presence on Lot 3 ever became an encroachment, even after the tax foreclosure sale. If one has the right to use a portion of another's land, that use cannot be an

"encroachment." If the Howells granted Gillum the right to use that portion of Lot 3 on which the home sits, she is not an encroacher at all. An "easement" is a property right or interest that gives its holder the limited right "to use but not possess the owner's land." State v. Newcomb, 160 Wn. App. 184, 191, 246 P.3d 1286 (2011). An "implied easement" is an easement created by law after an owner of two parcels of land uses one parcel to benefit the other to such a degree that, upon the sale of the benefited parcel, the purchaser could reasonably expect the use to be included in the sale. BLACK'S LAW DICTIONARY 645 (11th ed. 2019). Washington recognizes the legal concept of an implied easement based on a prior owner's use of the dominant and servient estates. See 17 WILLIAM B. STOEBUCK, WASHINGTON PRACTICE: REAL ESTATE: PROPERTY LAW § 2.5, at 93 (2d. ed. 2004); Adams v. Cullen, 44 Wn.2d 502, 505, 268 P.2d 451 (1954); Hellberg v. Coffin Sheep Co., 66 Wn.2d 664, 667, 404 P.2d 770 (1965); Boyd v. Sunflower Properties, LLC, 197 Wn. App. 137, 144, 389 P.3d 626 (2016). If the Howells granted Gillum an implied easement to use that portion of Lot 3 needed to use the mobile home, then the Arnold test would be inapplicable. But Gillum did not assert the right to remain on Lot 3 based on an implied easement. We therefore do not reach that issue here.

Nevertheless, substantial evidence does not support the trial court's finding that Gillum willfully or intentionally created an encroachment on Lot 3 or allowed it to continue once the Vogues rescinded permission for her to use that parcel of land. Because the record supports only one conclusion—that Gillum did not

willfully or knowingly create this encroachment—she satisfied the first <u>Arnold</u> element as a matter of law.

(2)   <u>Is the damage to the Vogues from the encroachment "slight" and the benefit of removing the encroachment equally small?</u>

Gillum contends the trial court erred in finding that the presence of her home on Lot 3 has caused the Vogues any more than "slight" damage.  We agree.

The trial court found that the damage to the Vogues is not "slight" because it prevents them from using the lot for any other purpose.  We conclude the trial court erred in its application of the second <u>Arnold</u> element.

In <u>Proctor</u>, the Supreme Court clearly held that "injunctions should not mechanically follow from any encroachment."   169 Wn.2d at 502.  Whether a particular encroachment causes damage to a landowner is not based on a rigid formula regarding the amount of land the encroachment encumbers.  <u>Id.</u> at 503.  The key question is "whether, in equity, it would be fair and just to require" Gillum to remove her entire house.  <u>Id.</u>  This element of the test inherently requires the court to view the detriment to the landowner in comparison to the detriment to an innocent encroaching party.

Here, between 2007, when the Vogues purchased Lots 4 and 5, and 2014, they had no interest in purchasing Lot 3.  They improved their two lots with the goal of building a vacation home at some undefined point in the future and were contented with that plan.  They admittedly chose not to buy Lot 3 when they learned the Howells wanted $10,000 for it because they knew Gillum's house sat on a portion of the lot.  But when they realized they might be able to purchase it for a fraction of that amount, their calculus as to the desirability of owning Lot 3 changed.

The Vogues nevertheless went into the purchase knowing that they would have to initiate litigation to resolve Gillum's right to remain on the lot.

The "damage" the Vogues incurred here is either the $1,315.37 they invested to acquire the land, based on the calculated risk that they could force Gillum off the property, or the value of their lost investment. Evidence at trial established that the fair market value of Lot 3, if unencumbered, is $10,000. At most, the damage to the Vogues is under $10,000.

As the Supreme Court stated in Proctor, the question is not whether an encroachment is "slight" in the absolute sense. 169 Wn.2d at 503. "The question [is] whether, in equity, it would be fair and just to require [the encroaching party] to remove their entire house" at significant cost because of a good faith mistake. Id.

In comparison to the damages the Vogues might face, the damage to Gillum exceeds $67,000. Berwick testified that the demolition of Gillum's home (spanning both Lots 2 and 3) would cost at least $15,000, and replacing the lost manufactured home with a new home would cost in the range of $42,000, with installation costs of another $10,000. Gillum has no resources to pay these expenses. She testified at trial that an injunction will effectively render her homeless. We believe the trial court abused its discretion in concluding that the damage to the Vogues is not "slight" compared to the monetary damage Gillum faces from the injunction.

This second element of the Arnold test also requires the court to assess the benefit of removing the encroachment. This leads to a challenging comparison of the parties' nontangible losses. We recognize that if Gillum's home remains, the Vogues will be unable to build the vacation home they now wish to build.

But to accomplish this benefit for the Vogues, Gillum must demolish not only structures on Lot 3 but also personal property (the mobile home) and structures (the storm barn and concrete pad) that rest exclusively on Lot 2. She will lose the only home she has known for over twenty years. If Gillum's home was a house with a market value of $300,000, rather than a trailer with little to no market value, no reasonable court would require Gillum to demolish the home when the adjacent landowners purchased the property for such a small sum and doing so with full knowledge of Gillum's decades of occupancy on the land.

We conclude the trial court erred in concluding that Gillum failed to establish the second element of the Arnold test.

(3)     If the encroachment remains, is there ample remaining room for a structure suitable for the area and no real limitation on the property's future use?

Finally, Gillum argues the trial court erred in applying the third Arnold element by failing to evaluate the Vogues' ability to construct a home on their adjacent lots. Again, we agree.

The trial court found that there is not enough room on Lot 3 to build any other structure if Gillum's home remains. The trial court refused to consider the impact of the encroachment on the Vogues' combined lots because they are "separate parcels." The Vogues argue that this approach is supported factually—each parcel is taxed separately—and justified legally because the outcome of the Arnold analysis should not depend on the identity of the landowner. They maintain that if someone other than the Vogues had prevailed at the tax foreclosure sale, then the court could have only considered Lot 3 in isolation, and the court did not abuse its discretion in doing so under these circumstances.

- 13 -

We cannot speculate what the outcome would have been had the purchaser been someone other than the Vogues. Under Proctor, the test is very fact-specific. It was the Vogues, not a hypothetical third party, who sued Gillum for ejectment. An action for injunctive relief is equitable in nature and the trial court has broad discretion to shape and fashion relief to fit "the particular facts, circumstances, and equities before it." Brown v. Voss, 105 Wn.2d 366, 372, 715 P.2d 514 (1986).

The Vogues testified that their plan had originally been to construct a vacation home on Lots 4 and 5. Travis Vogue confirmed that there is nothing preventing them from building on those two lots. Michelle and Travis Vogue both testified that it would be feasible to build a small two-bedroom home on these lots and still retain the use of the driveway, septic system, well, and other improvements that they had already built. This evidence establishes that the encroachment on Lot 3 does not limit the Vogues' use of Lots 4 and 5.

The Vogues argue that even if the court had considered all three lots combined when evaluating the third Arnold element, it still would have determined that the encroachment substantially impairs their use of Lots 4 and 5. With the ability to build a house on Lot 3, they contend, they can use Lots 4 and 5 for family members to camp or engage in recreational activities. Even if true, it does not address the fact that the Vogues had no intention of using Lots 4 and 5 in this manner until they thought they could acquire Lot 3 for pennies on the dollar with full knowledge of Gillum's claim to a portion of that lot.

We conclude the record does not support the trial court's findings as to the first, second and third elements of the Arnold test. We conclude Gillum established

- 14 -

her right to equitable relief and we remand to the trial court to fashion an appropriate remedy.

Reversed and remanded.

Andrus, C.J.

WE CONCUR:

Smith, A.C.J.

Appelwick, J.P.T.